UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KENNETH R. MERCER, and | ) | |
| CYNTHIA MERCER | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NUMBER |
| | ) | 1:03-CV-12282 MBB |
| RYDER TRUCK RENTAL, INC., and | ) | |
| WALTCO TRUCK EQUIPMENT COMPANY | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF ERIC V SKELLY

I, Eric V. Skelly, under oath hereby depose and state as follows:

1.  I am an attorney at the law firm of Mitchell & DeSimone, counsel to the Defendant, Waltco Truck Equipment Company ("Waltco").

2.  This affidavit is submitted in support of defendant Waltco's Motion for Summary Judgment.

3.  Attached to Defendant Waltco's Supplemental Memorandum in Support of Motion for Summary Judgment are true and correct copies of the following:

    Ex. G:  Excerpts from the Deposition of Philip L. Michaud, conducted on November 1, 2005;

    Ex. H:  Excerpts from the Deposition of Jeffrey Lilley, Day Two, conducted on November 22, 2005;

    Ex. I:  Excerpts from the Deposition of Michael Russo, conducted on October 24, 2005;

    Ex. J:  Excerpts from the Deposition of Timothy Tetreault, conducted on October 24, 2005.

    SUBSCRIBED AND SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 28th OF March 2006.

_____
Eric V. Skelly

# EXHIBIT "G"

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Volume 1
Pages 1-193
Exhibits: 11

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                   \*
KENNETH R. MERCER AND CYNTHIA    \*
MERCER,    \*
    \*
      Plaintiffs    \*
    \*  CIVIL ACTION
vs.    \*  NO.
    \*  1:03-CV-122282
RYDER TRUCK RENTAL, INC., AND    \*
WALTCO TRUCK EQUIPMENT COMPANY,    \*
    \*
      Defendants    \*
    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF **PHILIP L. MICHAUD**, taken on behalf
of **Defendant Waltco Truck Equipment Company**, pursuant to
the applicable provisions of the Federal Rules of Civil
Procedure, before **Christina M. Bromley**, Certified
Shorthand Reporter, Registered Professional Reporter, a
Notary Public within and for the Commonwealth of
Massachusetts, at **Keeches & Mallen**, 122 Dean Street,
Taunton, Massachusetts 02780, commencing at 9:30 A.M. on
**Tuesday, November 1st, 2005.**

ELLEN M. FRITCH & ASSOCIATES
373 SILVER STREET
SOUTH BOSTON, MASSACHUSETTS 02127
617-269-5448

13

A.   None, not there.

Q.   Why did you leave that job?

A.   I went to Garelick Farms to work for Garelick
Farms in their garage.

Q.   How did you find out about the Garelick Farms
job?

A.   My brother-in-law worked there.

Q.   Who?

A.   My brother-in-law.

Q.   What was his name?

A.   Tom Robello.

Q.   Now, do you have an updated resume?

A.   No, I don't.

Q.   Do you know if Tom Robello is still --

A.   He's not working there anymore.

     MR. DEVER:  Off the record.

     **(Off-the-record discussion.)**

Q.   All right, so you went to Garelick Farms in about
'91?

A.   Yes, the fall of '91.

Q.   And how long were you there for?

A.   Oh, there's a story that goes with it.  I worked
there for four and a half years, and then Ryder came
along.  They subcontracted the garage to Ryder at that

14

time, in about '97, and that's how I became working for
Ryder.  And I left Ryder, I left Ryder this past
February.

Q.    So February of '05?

A.    Yes.

Q.    Why did you leave?

A.    Go on my own.

Q.    Did you have any kind of friction with Ryder?

A.    I had a little friction with some of the bosses.

Q.    Who?

A.    The last time I had a friction was with Bob
Allen.

Q.    Okay, what was the nature of the problem you had
with Bob Allen?

A.    It was -- I don't know how you want me to
explain it you.  But he's the boss, and I really didn't
think he had enough experience in doing the job.  And
it's the old boss saying, "It's my way or no way."

      So I'm always the kind of person that if there's
a problem, I'll leave.  There's no use in making
conflict over nothing, I'll leave.

Q.    When did Bob Allen become your boss?

A.    I'm not sure, it was the fall of 2004 I think.

Q.    Who was your boss in '99 and 2000?

A.    '99 it was Greg Plant.  When we first went to
Ryder, it was Greg Plant.  And then when he left, it
became Rich Buckley.  And I had a problem with him, and
I asked to transfer to the Ryder shop in Warwick.  And
that was in 2000, in the spring of 2000.

Q.    All right, why don't we back up a little bit.

A.    I'm sorry.

Q.    When you first started with Garelick, where were
you physically working, what was the physical location?

A.    In Franklin, for Garelick it was in Franklin.

Q.    And you were working in their garage there in
Franklin?

A.    Yes.

Q.    How long did you continue working in that garage?

A.    Until I left to go to the Warwick shop in 2000,
the spring of 2000.

          MR. BROWN:  Could we go off the record for a
moment?

          MR. DiSCIULLO:  Yes.

          (Off-the-record discussion.)

Q.    And sometime in between '91 and 2000, you went
from working for Garelick to working for --

A.    -- Ryder, yes.

Q.    And I think from your testimony that happened in

of how these boxes were installed.

A.    Well, you weld the bracket onto the liftgate.
You retrofitted out from underneath the middle of the
truck to the passenger side of the liftgate.  They bolt
the bracket -- They bolt the pump and the liftgate box
to the bracket like the fact we had installed in the
middle of the truck.  And then you move the -- you put
another -- another bracket for the lever on the rod over
on the passenger side of the truck, and you hook the rod
up.  I mean that's how it's installed I mean.

Q.    Let me back it up a little bit then.  To do this
retrofitting --

A.    Mm-hmm, correct.

Q.    -- that involves removing the motor from the
liftgate, correct?

A.    Correct, it was then installed under the middle
of the truck.

Q.    Okay.  Well, we'll get to that in a moment.

A.    Okay.

Q.    So it involved removing the motor, correct?

A.    Correct.

Q.    And it involved removing the rod that goes
between the control handle and the motor, correct?

A.    Correct.

84

the section for air brakes, correct?

A.   Yes.

Q.   And is that -- Your testimony is that the
inspection of the air brakes is part of the
B inspection, correct?

A.   Correct.

Q.   All right.  So when we see on page 2
"C" Inspection Items, is it your understanding that the
"C" inspection items are all listed within that
subcategory before you get to the Federal Annual
Inspection category?

A.   Correct.

Q.   Now, in Exhibit 2 does your signature appear on
any of those documents?

A.   Yes, it does.

Q.   And that's the bottom right there (indicating)?

A.   Correct.

Q.   On both pages?

A.   Correct.

Q.   Now, I'll ask you this question again.  Do you
have any specific memory of performing the inspection
that's reflected on Exhibit 2?

A.   No.

     MR. DEVER:  That's the 8/18/99 one, correct?

MR. DiSCIULLO:  Yes.

Q.   Now, in the section entitled Liftgate Items, I see that you've checked off all the boxes?

A.   Correct.

Q.   And what is the significance of the checkmark?

A.   That we inspected it, and it checked out okay.

Q.   Now, if you inspect any particular item -- and we'll just talk about the liftgate items.

A.   Okay.

Q.   If you inspect any of those items and you find that one of the areas covered within that section requires your attention, will you make the change or make the correction and then put the check in?

A.   No.  It would be noted that -- On the left-hand side of the column there (indicating) there's a spot. You would put a circle next to it, and then you would come back after the PM was completed and repair it if their supervisor deemed it needed.

Q.   Okay.  So ultimately your goal would be to fix the problem and to be able to put the checkmark on the right-hand side?

A.   No, after you repaired the problem, it would get an X as being repaired.

Q.   I see.

origination on whenever that may have been, do you know
if that was in this time frame from 1997 until the
spring of 2000, or was that a later time?

A.   When the new ones came in, it was after that.

Q.   So would that have been after you returned to
Garelick in the spring of 2001 that the trucks
started -- that the new trucks started coming in with
the Waltco motor box on the passenger side, the best of
your memory?

A.   I think it was after.

Q.   Sometime after the spring of 2001?

A.   Yes.

Q.   Okay, fair enough.  So it's your testimony, as I
understand it, that between 1997 when you started
working for Ryder at Garelick until the spring of 2000,
that Ryder, based upon its repair work on the Garelick
Farms Waltco lifts, identified that there were ongoing
problems with the lifts, specifically that the
components, the motor components, were wearing out too
quickly?

        MR. DiSCIULLO:  Objection.

        MR. BROWN:  Objection.

A.   The motor itself.

Q.   And so it's your testimony that Ryder was

Q.    And so presumably, and I'm not trying to get super technical here, if the solenoid switch in February of 2000 wasn't working and needed to be replaced as identified by you, and there wasn't a solenoid part available to you when you did the repair, the PM, in order for that truck to go back into service, the solenoid would have to be replaced?

A.    Correct.

Q.    Otherwise the liftgate won't go up?

A.    Correct.

Q.    And so it would be held for a time until the solenoid switch could be actually installed?

A.    Correct.

Q.    Now, the truck that was involved in this accident we know is a 1999 International, and we know it's truck No. 2275.  To your knowledge, do you know anything about the sequencing of the numbers of the Garelick farm trucks?

A.    You mean the number, why 2275, 76, 74?

Q.    Yes, exactly.

A.    It's when they came in.

Q.    And you've been shown the exhibits from Mr. Parr's deposition showing truck No. 2275, correct?

A.    Correct.

124

Q.    And in these series of photographs you've
identified truck No. 2275 as a truck in which the
electric motor and the hydraulic reservoir had been
moved from its original position towards the center of
the liftgate to the passenger side?

        MR. BROWN:  Objection.

        MR. DiSCIULLO:  Objection.

A.    It looks like it, exactly.

Q.    Okay.  And it's your -- And with regards to this
series of photographs from Mr. Parr's deposition, it's
your testimony that that work in moving the electrical
box -- excuse me, the electrical motor and the hydraulic
reservoir tank would have occurred from the time the
truck originally came in to service at Garelick sometime
in 1999 to the -- up to the time you left in the spring
of 2000?

        MR. BROWN:  Objection.

A.    I don't know when it was done.

Q.    Okay, fair enough.  But it's your testimony that
in this time frame that we're talking about, '97 through
2000, you were aware that the trucks were coming into
Garelick with the electric motor and hydraulic reservoir
tank in the center of the truck, and that Ryder then was
moving it to the passenger side?

Q.    So when you order it, it's ordered as one unit?

A.    Yes.

Q.    And if were to unbolt it, you'd literally pull it out by the handle and it would slide out?

A.    Yeah, the handle and the shaft is all together.

Q.    Okay.

A.    The control levers are different, you have to bolt them on.

Q.    So, for instance, what we're talking about, if I wanted to take and replace the control shaft, I could detach a bunch of things, but eventually I would pull it out by the handle off the side of the truck, correct?

A.    Correct.

Q.    Because the handle and the control shaft are connected?

A.    Yes, it's one piece.

Q.    But before I pulled it out, I would have to disconnect the control levers because they get in the way of me pulling out?

A.    Correct.

Q.    All right. And the way I would do that is the same as with the control levers that go on it originally, which is that there are predrilled holes along the control shaft that allow the holes on the

control lever to be bolted up to the control shaft?

A.    Correct.

Q.    Okay.  And so in the time frame that Ryder was relocating the hydraulic motor for the liftgate to the passenger side, from the middle to the passenger side, they simply -- "they" being Ryder -- simply worked off of predrilled holes along the Waltco control shaft?

        MR. BROWN:  Objection.

        MR. DiSCIULLO:  Objection.

A.    Yes, they used those holes over there for the hook, the safety hook.  When you lower, you know, when you back it up or whatever.  When you close the liftgate, when you're all done with it --

Q.    Right.

A.    -- that hook latches to the liftgate so it doesn't fall.

Q.    Right.

A.    And then you have to -- they had to drill another hole with a new lever in it.

Q.    Okay, all right.  And if you just draw another hole.

A.    Okay, it would be there's your other hole (drawing).

Q.    And if I draw a line down -- an arrow to it

(drawing and labeling) and label that "new hole," that
would be reflective of what Ryder was doing, correct?

A.   Correct.

Q.   Okay.  So in terms of the Waltco control shaft,
it would have predrilled holes; and when Ryder made a
decision to relocate the motor and the hydraulic
reservoir, they still needed to use the predrilled holes
for the hook?

A.   Correct.

Q.   The safety latch?

A.   Yes.

Q.   At the center of the truck, center of the lift,
right?

A.   Correct.

Q.   Right.  But in order to have the control rod
attached to the control shaft closer to the passenger
side, Ryder then drilled the Waltco control shaft with a
new hole and fitted it with a new control lever so that
the attachment could be made?

MR. BROWN:  Objection.

A.   Yes, it was drilled and timed in the same angle
or same lever angle that it was at the original.

Q.   And so that we're on the same page here, when you
say it was drilled and timed the same way, that would be

like if we had the control rod right out in front of us, just bare control rod (indicating), with some of these -- Excuse me, I don't want to mix up my terms.

     MR. BROWN:  Control shaft.

  Q.   If we had the control shaft and we were looking right down it like the barrel of a gun, we would want to have all the holes that were being drilled line up like they were facing straight up and straight down?

  A.   Correct.

  Q.   And, similarly, once all the control levers were put into place, we would want to look down the barrel of that control shaft, and all the control levers would be pointing straight up in the same direction?

  A.   Correct.

  Q.   They all lined up?

  A.   Correct.

  Q.   And that's what you mean by "timed"?

  A.   Correct.

  Q.   Okay, just different language I hadn't heard before.

  A.   Okay.

  Q.   And the concept is, Ryder's concept was, that you would want it to function mechanically the way it was intended by Waltco to operate?