# EXHIBIT "H"

## Page 1

```
    UNITED STATES DISTRICT COURT
      DISTRICT OF MASSACHUSETTS
            CIVIL ACTION
          NO. 1:03-CV-12282 MBB
*********************************
KENNETH R. MERCER &              *
CYNTHIA MERCER,                  *
    PLAINTIFF                    *
VS.                              *
RYDER TRUCK RENTAL INC. &        *
WALTCO TRUST EQUIPMENT           *
COMPANY,                         *
    DEFENDANT                    *
*********************************
```

    **CONTINUED DEPOSITION of JEFFREY LILLEY**, a witness called on behalf of the Defendant, pursuant to the applicable provisions of Federal Rules of Civil Procedure, before Marjorie L. Simmons, a Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts on Tuesday, November 22, 2005, commencing at 9:15 a.m., at the offices of Keches & Mallen P.C., 22 Dean Street, Taunton, Massachusetts.

                ELLEN FRITCH & ASSOCIATES
                     Court Reporters
                    373 Silver Street
              S. Boston, Massachusetts 02127
                      (617) 269-5448

## Page 2

APPEARANCES:

Brian C. Dever, Esquire
**KECHES & MALLEN P.C.**
122 Dean Street
Taunton, Massachusetts 02780
On Behalf of the Plaintiff.

Deanna C. Salemme, Attorney
**MITCHELL & DESIMONE**
99 Summer Street
Boston, Massachusetts 02110
On Behalf of Waltco Truck
Equipment Company.

Peter Brown, Esquire
**TENTINDO, KENDALL, CANNIFF & KEEFE LLP**
C-3 Shipway Place
Boston, Massachusetts 02129
on Behalf of Ryder Truck Rental Inc.

## Page 3

### INDEX

| Testimony of: | Page: |
|---|---|
| **JEFFREY LILLEY** | |
| Examination by Mr. Dever | 4, 75, 125 |
| Examination by Ms. Salemme | 10, 113 |

### EXHIBITS

| Number: | | Page: |
|---|---|---|
| Exhibit 8 | Notice of deposition | 11 |
| Exhibit 9 | Invoice | 37 |

## Page 4

### STIPULATIONS

It is hereby stipulated by and between counsel for the respective parties that the reading and signing of the deposition are not waived. The filing of the deposition and notarization are waived.

It is further agreed and stipulated that all objections, except objections to the form of the question, and all motions to strike, are reserved for the time of trial.

**JEFFREY LILLEY**,

a witness called for examination by counsel for the Defendant, having been duly sworn, was examined and testified as follows:

**CROSS EXAMINATION**
**BY MR. DEVER:**
Q. Mr. Lilley, as you recall my name is

Page 21

1  him to go around that date?
2       MS. SALEMME: Yes, please.
3  Q. I would just like you to look at the
4  vehicle control card.
5  A. Okay.
6  Q. Now, based upon this DD0 9/22/2000, can
7  you tell from the vehicle control card
8  what, if any, repair or adjustment was
9  done as a result of this complaint?
10 A. Not on this page. There's nothing on
11 this page.
12      MR. BROWN: Objection.
13 Q. Any other page in the vehicle control
14 card that would give you that
15 information?
16      MR. BROWN: Do you want him to
17 review every page?
18      MS. SALEMME: If he thinks every
19 page would be helpful, around the time of
20 the incident would be helpful.
21 A. Go back -- this is July here, more
22 forward. There is something here in
23 November.
24 Q. What date?

Page 22

1  A. Looks like 11/9.
2  Q. What does that 11/9 --
3  A. Looks like they did some repairs to the
4  lift gate.
5  Q. I am sorry -- go ahead.
6  A. It says "repair the reservoir"?
7  Q. And from that repair of the reservoir on
8  11/9 --
9  A. Yes.
10 Q. -- is that where it says "electric power
11 tailgate replace pump motor"?
12 A. That is above it. Maybe it was the old
13 --
14 Q. Can you tell from the 11/9/00 entry that
15 says "replace pump motor" --
16 A. Yes.
17 Q. -- where or from whom that pump motor
18 would have been provided, for example,
19 which manufacturer?
20 A. No. This card won't show you that
21 information.
22 Q. Is there a document that Ryder has that
23 would indicate the manufacturer of the
24 part used on 11/9/00?

Page 23

1  A. Possibly a copy of the work order would
2  have listed the --
3  Q. Where would that be?
4  A. Would not be accessible to me because it
5  is over a year old.
6  Q. Okay.
7  A. I don't know where it would be.
8  Q. What do you mean, not accessible to you,
9  has it been destroyed?
10 A. No. Our computer system is set up as
11 such, any work orders over a year old are
12 purged from the system to make more room,
13 I guess, to --
14 Q. Who would know that?
15 A. I don't know.
16 Q. As the person most knowledgeable by
17 Ryder, you don't know whether or not that
18 pump motor that was replaced is a Waltco
19 pump motor or from some other
20 manufacturer, is that correct?
21 A. That is correct.
22 Q. And you mentioned that there are some
23 other entries around the same time
24 regarding the lift gate on this vehicle

Page 24

1  control card?
2  A. I saw one other.
3  Q. Is that the "repair reservoir"?
4  A. On 11/6, correct. Originally I thought
5  it was a 11/9. It's 11/6.
6  Q. One of those appears to be "repair
7  reservoir"?
8  A. Correct.
9  Q. You believe that is the reservoir on the
10 lift gate?
11 A. Yes, it is.
12 Q. Is that because it is says "055"?
13 A. That is correct.
14 Q. Can you tell or from your knowledge would
15 you be able to tell us what "repair
16 reservoir" means?
17 A. I don't know, no, what it means.
18 Q. What could it mean?
19      MR. BROWN: Objection.
20 A. It would mean that something was done,
21 did not require the replacement of a
22 part. When we do a repair task there are
23 no parts involved.
24 Q. Could that have been like an adjustment

Mercer vs. Ryder Truck et al     Deposition of Jeffrey Lilley, Day 2 11/22/05

Case 1:03-cv-12282-MBB    Document 31-3    Filed 03/28/2006    Page 4 of 17

**Page 37**

1    A. I was designated the person to come and
2       answer these questions. I knew nothing
3       of the accident so if someone else knew
4       about the accident, then they certainly
5       knew more than I did.
6    Q. Do you know of anyone else who knows more
7       about Mr. Mercer's accident at Ryder?
8    A. I don't.
9    Q. So is it fair to say that as Ryder's
10      representative you do not know whether or
11      not there were any non-Waltco parts on
12      the lift gate at the time of Mr. Mercer's
13      accident?
14    A. That is correct.
15    Q. I just want to show you a document
16      produced by your counsel very recently.
17          MR. BROWN: I am looking for the
18      invoice you just sent over. Here, it is.
19          MS. SALEMME: Can we mark that
20      invoice as Exhibit No. 9.
21
22          (Exhibit 9, Invoice, Marked for identification.)
23    Q. Mr. Lilley, I am showing you an invoice
24       produced by your counsel. Could you take

**Page 38**

1       a minute and just review that.
2    A. I have seen it.
3    Q. Okay. And could you tell me what it is?
4    A. It is an invoice for relocating the pumps
5       and motor on these trucks that we are
6       talking about.
7    Q. And do you see on the invoice --
8    A. There is two dates.
9    Q. Okay. The box up top where it says
10      "date" could you tell me?
11    A. That is the invoice date.
12    Q. And there is a job date also?
13    A. That is correct.
14    Q. And could you read what that the job date
15      says?
16    A. 11/3/01.
17    Q. Could you tell me, do you see truck
18      numbers listed on the invoice?
19    A. Two.
20    Q. And those -- one of the truck is 2275?
21    A. Yes, it is.
22    Q. And is that your understanding of the
23      truck that was involved in Mr. Mercer's
24      accident?

**Page 39**

1    A. That is what I am told.
2    Q. Okay. And can you tell me, do you know
3       why the repositioning and installing of
4       the lift box occurred on truck 2275 back
5       on November 3, 2001?
6    A. Yes.
7    Q. Why was that?
8    A. The lifts, they are originally built with
9       the pump motor assembly in the center of
10      the lift, with no real protection. They
11      were exposed to the elements. And we had
12      an awful problem with the electronic
13      motors getting full of the sand and salt
14      in the wintertime causing them to fail
15      so --
16    Q. I'm sorry. Go ahead.
17    A. We decided the best thing to do would be
18      to try and protect them. Waltco didn't
19      have a box available for them. They told
20      us it was because even though they had
21      boxes on all of their other lifts, these
22      lifts had the manual controls put on them
23      and they couldn't put a box on them.
24      They didn't make one for them.

**Page 40**

1       We took a look at the truck and
2       decided to move the box on the side
3       behind the wheels where protected by the
4       mud flaps. Then had the box
5       manufacturer, had Mr. Narducci had
6       someone manufacture the boxes to put them
7       in to protect the motors.
8    Q. And how do you know all of this
9       information? Did you have any
10      conversation with Waltco about this
11      issue?
12    A. I did.
13    Q. Who did you speak to at Waltco?
14    A. I don't know.
15    Q. When did that conversation occur?
16    A. Around the time of this retrofit.
17    Q. And was that the only conversation you
18      have ever had with Waltco?
19    A. Only conversation I had with them, was
20      there some sort of protective box
21      available that we could install where
22      they were originally, mounted. And they
23      had nothing for us. So then we got
24      together with John and came up with this

**Page 41**

1      plan to move them where they would be
2      better protected and to put them in some
3      sort of a sealed box.
4    Q. Okay. And why did you get involved in
5      this situation back in 2001?
6          MR. BROWN: Objection.
7    A. In 2001 I was the service manager there.
8      I was responsible for the operations of
9      the shop and one of the problems we were
10     having was these premature lift failures
11     which usually turned out to be road calls
12     when the lift would be on the ground and
13     you couldn't -- when the motors fail the
14     lift would be on the ground, you couldn't
15     get it up any more.
16    Q. Is that the only thing, when the electric
17     motor failed, that lift would get stuck
18     in the position?
19    A. The lift wouldn't be stuck in a position,
20     however, once it made all the way to the
21     ground it would never go back up. You
22     need the electric motor to go -- it
23     needs the electric motor.
24    Q. Does the electric motor have anything to

**Page 42**

1      do with the creeping of the lift gate?
2    A. No.
3    Q. How do you know?
4    A. The electric motor has nothing to do with
5      the downward but up -- they're call a
6      different name, power down I think they
7      call it. These lifts are not power-down,
8      they are gravity-down.
9    Q. Would the fact that this lift was
10     repositioned back in 2001 on these two
11     particular trucks, have any relevance to
12     Mr. Mercer's complaint about the
13     creeping?
14         MR. BROWN: Objection.
15    A. No. We did about 40 trucks all together.
16    Q. Who did the trucks?
17    A. John Narducci.
18    Q. And when did this repositioning process
19     on the 40 trucks begin?
20    A. Right around this date. I don't have an
21     exact date, somewhere around the fall of
22     2001.
23    Q. Okay. And so even though at this point
24     in 2001, I believe it is your testimony

**Page 43**

1      that you became service manager in 2000,
2      is that correct?
3    A. It was May -- was it 2000. It might have
4      been 2000, I think it was.
5    Q. So is it your testimony that even though
6      you were service manager beginning in May
7      of 2000 that you were not notified of Mr.
8      Mercer's injury?
9    A. Excuse me, it might have been 2001 I
10     became service manager. I believe it was
11     May of 2001.
12    Q. Okay. Service manager, that was after
13     you were the team leader, the service
14     team leader?
15    A. That is correct. Yes.
16    Q. And so is there a way for you to verify
17     when you became service manager?
18    A. I don't know.
19         MR. BROWN: Objection.
20    Q. The service team leader, you were service
21     team leader of shift one and two, is that
22     fair to say?
23    A. At different times, yes.
24    Q. When were you service team leader of

**Page 44**

1      shift one?
2    A. Prior to becoming service manager.
3    Q. Okay. So that is the day shift?
4    A. That is correct.
5    Q. How long were you service team leader of
6      shift one?
7    A. I don't know exactly.
8    Q. Would that have been during the time
9      period in the year prior to becoming
10     service manager?
11    A. It was the time period just before I
12     became service manager. I went from
13     first shift leader to service manager.
14    Q. Then service team leader. Would you have
15     become aware of an injury to a driver?
16     Is that something that you --
17    A. I wasn't aware of this one.
18    Q. Would you have become aware of other
19     injuries --
20    A. It is possible.
21    Q. -- to drivers?
22    A. It is possible.
23    Q. How do you know you were never made aware
24     of this one?

# EXHIBIT "I"

1

VOLUME I
PAGES 1-229
EXHIBITS 1-6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO. 1:03-CV-12282 MBB

---

KENNETH R. MERCER
and CYNTHIA MERCER,
    Plaintiffs,

vs.

RYDER TRUCK RENTAL, INC. and
WALTCO TRUCKING EQUIPMENT COMPANY,
    Defendants.

---

DEPOSITION OF MICHAEL RUSSO, called as a witness by and on behalf of the Plaintiffs, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before **Ivy L. Natanson**, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken at **Dean Foods**, 124 Grove Street, Franklin, Massachusetts, on Monday, October 24, 2005, commencing at 9:30 a.m.

ELLEN M. FRITCH & ASSOCIATES
373 SILVER STREET
SOUTH BOSTON, MASSACHUSETTS 02127
(617) 269-5448

137

1     A.   Right.
2     Q.   Correct?  All right.  And do you know in
3  that entry, having looked at this document -- and
4  your counsel has a copy of it -- have you seen this
5  before today, sir?
6     A.   No.
7     Q.   How do you know that that's your
8  signature?
9     A.   That's the way I sign my checks.
10    Q.   And the "repaired lift and adjusted,"
11 there would be an adjustment made to the angle of
12 the lift if the driver was complaining about the
13 lift being at too much of an angle, correct?
14    A.   I would say that's what the adjustment
15 was, right.
16    Q.   And the "repaired lift," do you know what
17 that is referencing?
18    A.   Let's see.  "Lift gate does not stay up
19 all the way."  I would have to assume the gate
20 didn't go all the way to the top.  It was probably
21 getting jammed but I can't remember exactly.
22         MR. BROWN:  He asked you what
23 "repaired lift" was.
24    A.   That's where the repair would probably be.

157

1    A.    Correct.
2    Q.    Adjustment.  So you did that work on
3  November 1st; you would have completed that work on
4  adjusting the lift gate on November 1st, correct?
5    A.    Right.
6    Q.    And then going back to the DVCRs, we note
7  that by November 4, 2000, that the drivers are again
8  complaining that the lift gate slowly lowers by
9  itself, correct?
10           MR. BROWN:  He's asking if you see
11  that.
12    A.    Right, I see that.
13    Q.    Okay.  And then we see the entry --
14           MR. BROWN:  Hold on one second.  Go
15  ahead.
16    Q.    Then we see the entry in the vehicle
17  control card for that time frame, November 6, 2000,
18  that, again, they have it 055010002, "repair
19  reservoir hydraulic lift system," comma, "lift
20  TRU."  Do you see that entry?
21           MR. BROWN:  Do you see that?  The
22  corresponding date is on the previous page.  That's
23  November 6.
24           THE WITNESS:  November 6.

                                                                    158

1          MR. BROWN:  He's asking if you see
2  that.
3       A.   All right.  I see that.  That's November
4  6, right?
5       Q.   And that number corresponds -- as you look
6  at that entry for November 6, you don't know if
7  that's referencing a replacement part or just a task
8  performed, correct?
9           MR. BROWN:  Reading this, do you know
10 if that means repair or replace, if you can tell.
11          THE WITNESS:  What's that?
12          MR. BROWN:  Can you repeat the
13 question, Brian?
14      Q.   Looking at that entry on the vehicle
15 control card, you don't know if that is
16 referencing -- just referencing a task, i.e.,
17 someone fixed something or adjusted something, or if
18 someone ordered a part to be replaced?
19          MR. BROWN:  He's asking if you know.
20      A.   No.
21          MR. BROWN:  Okay.
22      Q.   Back in March, we were showing you the
23 DVCR that Mr. Parr did some work on, and there's a
24 reference here to March 7.  Do you see this entry?

```
                                                          159
 1    This would be -- this is Lilly Exhibit 2.  Do you
 2    see this entry for --
 3              MR. DEVER:  This is a different
 4    document.
 5              MR. BROWN:  Yeah, I got it.
 6         Q.   Do you see this entry for March 7, 2000?
 7         A.   Yeah.
 8         Q.   In this entry, do you see what part is
 9    being replaced?  Can you tell looking at that?
10         A.   Sure, I can.
11         Q.   What?
12         A.   It looks like the motor had a problem.
13         Q.   Because it says "replace pump motor"?
14         A.   Right.  If it actually was, I couldn't
15    tell you, but that's what it says on the paper.
16         Q.   But you don't know looking at this Exhibit
17    2 from Lilly's deposition what -- this is not a
18    document that you're familiar with, correct?
19         A.   Right.
20         Q.   And then if we go up to the time frame
21    that we were talking about in September of 2000, if
22    we follow along, we're looking in August, see these
23    entries for August and early September?  Do you see
24    these entries?
```

160

1   A.   Yeah.
2   Q.   And then if we turn the page and we go up
3   from November 3rd, November 6th, we have an entry,
4   again, "replace pump motor." Do you see that, the
5   entry?
6   A.   Okay.
7   Q.   So that would reflect, would it not, that
8   despite whatever adjustment you made on November
9   1st, 2000, by the time frame of November 4th, 2000,
10  they're ordering a replacement part for this lift
11  system?
12  A.   Say that again.
13  Q.   Yeah. When we were looking at the
14  preventative maintenance sheets --
15  A.   Right.
16  Q.   -- and your PM follow-up sheet, you were
17  saying that you were making an adjustment to the
18  lift gate, correct?
19  A.   Okay.
20  Q.   Yes?
21  A.   Yeah.
22  Q.   That's what they said and you told us
23  about that?
24  A.   Yeah.

161

1  Q.  And then by November 4, looking at the
2  DVCRs, you can again see that the driver, truck
3  driver, Mr. Howell, on November 4th is complaining
4  that the lift gate is again lowering by itself,
5  correct?
6  A.  The DVCR?  Okay.
7      MR. BROWN:  I will show him the DVCR.
8  This is the DVCR he's referring to.
9  A.  Okay.
10 Q.  And that so we have the dates of September
11 20 where there's a complaint about the lift not
12 going up all the way or staying up all the way,
13 correct?
14 A.  Okay.
15 Q.  Then we have the complaint of September
16 30th where the lift is not staying up by itself,
17 correct?
18 A.  Okay, yeah.
19 Q.  And then we know that you did a PM
20 inspection in which you adjusted the lift gate on
21 November 1st, correct?
22 A.  Right.
23 Q.  And then on or about November 4th, the
24 driver again is complaining that the lift gate is

162

1  dropping by itself, correct?
2      A.    Okay.
3      Q.    And then on November -- sometime
4  thereafter, by November 6th, under the vehicle
5  control records kept by Ryder, they're replacing the
6  part on the lift assembly, correct?
7      A.    Yeah.
8      Q.    Would that indicate to you that just
9  sequentially what was going on is that you all --
10 you at Ryder were trying to diagnose the problem
11 with this lift gate not staying up and you were
12 taking it one step at a time and finally the part
13 was replaced?
14          MR. BROWN:  Objection.
15     A.    Not necessarily.  The motor things,
16 they're different, different things.
17     Q.    I suggest to you, sir, that we don't know
18 from the testimony we've heard from the people who
19 know how to read these vehicle control cards as to
20 whether or not that is actually a motor being
21 replaced or the needle assembly system being
22 replaced.  It's just how they identify it.
23          If what was being replaced by Mr. Parr
24 back in March was a needle assembly system and what

# EXHIBIT "J"

1

**VOLUME I**
**PAGES 1-74**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO. 1:03-CV-12282 MBB

---

KENNETH R. MERCER
and CYNTHIA MERCER,
   Plaintiffs,

vs.

RYDER TRUCK RENTAL, INC. and
WALTCO TRUCKING EQUIPMENT COMPANY,
   Defendants.

---

DEPOSITION OF TIMOTHY TETREAULT, called as a witness by and on behalf of the Plaintiffs, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Ivy L. Natanson, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken at **Dean Foods**, 124 Grove Street, Franklin, Massachusetts, on Monday, October 24, 2005, commencing at 2:45 p.m.

ELLEN M. FRITCH & ASSOCIATES
373 SILVER STREET
SOUTH BOSTON, MASSACHUSETTS 02127
(617) 269-5448

```
                                                            29
 1         A.    It is.
 2         Q.    Under the complaints or defects, it says
 3   "lift angle too far back toward truck.  Milk
 4   sliding off lift under truck."  Do you see that?
 5         A.    I do.
 6         Q.    And then up above, it says "adjusted lift
 7   gate."  Do you see that?
 8         A.    Yes.
 9         Q.    Is that your handwriting where it says
10   "adjusted lift gate"?
11         A.    Yes.
12         Q.    Can you tell, looking at that document,
13   what the defect was and what you did?
14                    MR. BROWN:  Objection.
15         A.    It was just an adjustment of the angle of
16   the deck.
17         Q.    And is that something you remember or is
18   that something you can tell just by looking at the
19   document?
20         A.    Just by looking at the document.
21         Q.    You don't remember doing that work?
22         A.    No.
23         Q.    Okay.  But the type of language that's in
24   there tells you -- is specific enough that allows
```