UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KENNETH R. MERCER and    )
CYNTHIA MERCER           )
    Plaintiffs,          )
                         )
vs.                      )    CIVIL ACTION NUMBER: 1:03-CV-12282 MBB
                         )
RYDER TRUCK RENTAL, INC. )
    Defendant            )

PETITION FOR APPROVAL OF SETTLEMENT
PURSUANT TO G.L. c. 152 § 15

### I. Plaintiff's Position

#### Liability

Kenneth Mercer (now age 51) was injured on September 30, 2000, during the course and scope of his employment as a delivery driver for Garelick Farms. Mr. Mercer claims that the hydraulic lift gate on his delivery truck failed to operate properly causing his injuries. Mr. Mercer claims that the lift gate was negligently maintained by Ryder Truck Rental.

Specifically, on the date of the accident, Mr. Mercer loaded product on the hydraulic lift on the back of his truck. He claims that thereafter the lift lowered by itself 6-8 inches. As he brought a third load onto the lift, he stepped back onto the lift. Because it was lower than expected, he lost his balance, twisted and fell forward with the load injuring his back and neck.

#### RYDER TRUCK RENTAL LIABILITY

It is clear from the testimony to date that as of 1997, Ryder had a "captive" facility at the Garelick Farms location in Franklin, Massachusetts. Ryder was responsible for all of the maintenance and repairs of the vehicles at this location. When the Garelick drivers finished their route, they would turn in a DVCR to Ryder and Ryder was responsible for responding to the DVCR and all routine maintenance. This case involves a hydraulic lift. The hydraulic system is a closed system whereby hydraulic fluid is pumped into a cylinder to engage a piston to lift the

lift or release hydraulic fluid to allow fluid out of the cylinder to lower the lift. The lift is designed to go up or down manually. It is not supposed to creep or lower on its own. The Rule 30(b)(6) designee for Ryder testified that if in a Driver Vehicle Condition Report (DVCR) there was a report of the hydraulic lift not functioning properly, there was a standard procedure that would take place regarding diagnosing and repairing the lift. It should be noted that according to Ryder testimony, with regards to the lift dropping, there were no "adjustments" to be made. The lift either had to be repaired, (by being repaired, this meant replacing a part that was causing the hydraulic fluid to leak) or if there was no leak found, to try to re-create the condition.

Ryder testified that the Ryder people would look for leaks and look at the valves. If they could not find a leak, they would put weight on it and leave it for several hours and, if they could not re-create the condition, they would talk with the operator. If after talking with the operator as to how he activated the handle to move the lift and they thought he was doing it properly, they would go further into their investigation and look to an internal leak within the valves before releasing the lift for use. Ryder's testimony was that the vehicle should not be put back into use until the cause of the lift dropping was found and remedied.

What is clear from Ryder testimony is that when there are complaints about creeping or leaking of the hydraulic lift, which there were on March 6, 2000 and again on September 20, 2000, the thought process of a Ryder mechanic should be that it is most probable a situation where there is a leak in the hydraulic system. According to Ryder, there is also another possible cause of the lowering lift which involves the proper methodology of operating the lever. Mr. Mercer is quite clear that he knew how to find neutral on the liftgate handle. In addition, since the work records show that the hydraulic pin was replaced before and after the accident then, logically, it was not this lever activation problem at issue in Mr. Mercer's accident. Therefore, logically, you must go back to the issue of a leak in the system.

With regard to the leak in the system, the testimony of a mechanic for Ryder at the Garelick facility, is that back in March 2000, based on the Driver Vehicle Condition Report (DVCR) the lift was "leaking down" or lowering down by itself. The mechanic believed the cause of the lowering liftgate to be a leak in the hydraulic system. Consequently, the mechanic

replaced the pin-needle assembly, which is the "O" ring seal on the hydraulic pump motor of the power tailgate. What we have in terms of a paperwork trail, is the complaint of the lift lowering on March 6, 2000 in the DVCR report. On the Vehicle Control Card, there is a March 7, 2000 entry indicating that the part was replaced

Thereafter, there was not a problem with this lift until complaints of creeping down again in September 2000. The September 20, 2000 VCR report indicates that the lift gate does not stay up all the way (same problem as March 2000) and that the lift gate is at too much of an angle. It must be noted that according to the testimony, these are two separate and distinct problems. The angle of the lift gate can be adjusted or repaired. As discussed earlier, the lift creeping/lowering is not an adjustment. It must be replaced with a part that is causing the leak or otherwise diagnosed before being put back into service.

The mechanic's note on the September 20, 2000 DVCR report indicates that he "repaired lift and adjusted". However, given the testimony regarding what the proper procedure would be to handle a lift gate that was dropping, it is clear that the mechanic did nothing to address the dropping lift gate problem. This problem cannot be adjusted as previously discussed. The adjustment references the work he did on the angle of the lift gate, a completely separate and unrelated issue. In addition, these is nothing in the Vehicle Control Card report that shows that any part was replaced like it was on March 7, 2000 when the same problem was occurring.

On September 30, 2000, the same problem with the lift gate dropping occurs again and Mr. Mercer is injured. Again it is noted on the DVCR report of that day that the lift gate was dropping. Again, it is noted that this issue was repaired and adjusted. However, again this is not the solution to the problem, and we have the same problem documented in the November 4, 2000 DVCR report. It is not until this occasion that the mechanic takes the appropriate steps and replaces the same part that was replaced on March 7, 2000. On this occasion, there is documentation that on November 9, 2000, the same part # 055 015 002 is replaced to correct this problem. This is the exact same part and number that was replaced on March 7, 2000.

The plaintiff claims that had this problem been addressed correctly by the mechanic, based on the September 20, 2000 DVCR report, the part would have been replaced then and the lift gate would have been working properly on September 30, 2000, the date of Mr. Mercer's

-3-

accident. If for whatever reason there was no part to replace because the mechanic could not find a leak, the mechanic should not have put the vehicle back in service until the reason for the drop was determined. There is nothing to indicate that the mechanic took any of the necessary steps which included:

re-creating the drop, speaking with the driver to re-create the drop, reviewing with a supervisor and calling the technical hotline. Without doing any of these to find the source of the problem, the mechanic should not have allowed the vehicle to be put back into service and violated standard procedures for Ryder's mechanics.

## DAMAGES

As a result of his accident of September 30, 2000, Mr. Mercer suffered a severe back injury which in and of itself has permanently and totally disabled him from any work. His back injury includes a disc herniation at the L4-L5 level and narrowing of the L5-S1 interspace. Due to his back injury, on April 18, 2002, Mr. Mercer had a left hemilaminectomy and medial facetectomy and foraminotomies of L5 ans S1 roots surgery performed by Neurosurgeon, Dr. Howard Blume. Secondarily, Mr. Mercer suffered a neck injury which ultimately required a C4-C6 laminectomy surgery performed by Neurosurgeon, Dr. Stephen Saris. In addition to his physical injuries, Mr. Mercer suffered from depression and anxiety, and treated with Psychologist Peter Cherchia, Ph.D. The plaintiff claims that Mr. Mercer's physical injuries have permanently and totally disabled him from any work.

At the time of the accident, Mr. Mercer immediately felt severe pain in his buttocks and low back. The pain radiated from the low back into his left leg. On October 2, 2000, Mr. Mercer was seen at Franklin Primary Care (part of Tri-County Medical Associates, Inc) by Dr. Eric Kohler, M.D. Dr. Kohler's assessment was that Mr. Mercer had a sprain of the lumbrosacral and carpal tunnel syndrome. Dr. Kohler stated that according to Mr. Mercer's medical history both were work related. He was told to wear a splint on the right wrist at night and minimize its use. For the back pain, Mr. Mercer was given Flexeril, Naprosyn, and told to avoid heavy lifting. He was told to call or return if the problems got worse or did not improve within the next week.

On October 3, 2000, Mr. Mercer went to Milford-Whittinsville Regional Hospital. He was seen in the Outpatient Department and given a physical therapy evaluation. Mr. Mercer had severe pain that went to the top of his buttocks and severely compromised movement due to the injury at work. He would need medication to control the pain and lessen irritability. They recommended that he have physical therapy twice a week for the first four weeks. From October 3, 2000 through December 6, 2000, Mr. Mercer was seen at the Whitinsville Medical Center for Physical Therapy.

On October 6, 2000, Mr. Mercer was seen at Franklin Primary Care again. He had been to physical therapy twice, but was still experiencing symptoms. His pain was localized in the left lower back radiating into the left buttock and was exacerbated by lifting or bending. Mr. Mercer was told to continue with physical therapy, as well as the medications he was prescribed, and to follow up with the doctor in a week's time. He was also given a note to remain out of work. On December 7, 2000, Mr. Mercer had an Functional Capacity Evaluation at HealthSouth. The results were as follows: evaluation showed the prognosis was good for a return to work assuming that the recommended physical therapy and work conditioning took place. This evaluation also gave maximum lifting capacities. The evaluation included range of motion, strength, gait, palpitation, skin, and posture pre-testing. This was followed by a dynamic lifting test, isometric strength testing unit, endurance testing, and a post test to compare with the pre-testing results.

From December 21, 2000 through March 9, 2001, Mr. Mercer underwent physical therapy at HealthSouth for his back injury. The treatment included stretching, progressive strengthening, stabilization, cardiovascular conditioning, manual therapeutic exercises, modalities, and education. He was discharged on March 9th because progress had reached a plateau and no further gains could be made at that time.

On January 12, 2001, Mr. Mercer was seen by Dr. David J. Cicerchia, M.D. at the Orthopedic Group, Inc. in Lincoln, Rhode Island. His main complaint was left side low back pain and left thigh pain. Radiographs were taken which showed that Mr. Mercer had multilevel degenerative disc disease and osteoarthritis of the lumbrosacral spine, as well as a L5-S1 disc. Vioxx was prescribed.

-5-

On February 12, 2001, Mr. Mercer underwent an MRI of the lumbar spine at Open MRI of New England. The overall impression was degenerative change in the lumbar spine resulting in mild central stenosis from L2-3 to L5-S1 as well as moderate to severe bilateral foraminal stenosis from L3-4 to L5-S1. There was also moderate left L2-03 and mild right L2-3 foraminal stenosis.

On February 23, 2001, Mr. Mercer had another appointment with Dr. Cicerchia. The MRI from February 12th was reviewed and showed multilevel degenerative disc disease and spondylosis particularly moderate to severe at the left L2-3. Dr. Cicerchia determined that Mr. Mercer would remain out of work and they discussed options for treatment if symptoms persisted.

On April 20, 2001, Mr. Mercer had another follow up visit with Dr. Cicerchia. Mr. Mercer had undergone two spinal injections and still experienced no relief. Mr. Mercer continued to be out of work and had an epidural steroid injection (ESI) scheduled. He still walked with a gait favoring his left lower back. Mr. Mercer determined that he would rather try the epidural injections than consider a permanent partial disability at the current time.

On July 31, 2001, Follow up with Dr. Cicerchia. Mr. Mercer still had pain in his left lower back, left buttock, and thigh. He continued to favor his left lower back. Surgical intervention was recommended and Mr. Mercer stated that he was going to seek a second opinion from a neurosurgeon (Dr. Blume). Dr. Cicerchia didn't think Mr. Mercer could return to his prior job in this condition.

On October 18, 2001, Mr. Mercer had an MRI at UMass Memorial MRI and Imaging Center ordered by Dr. Howard Blume. The conclusions were a small central disc herniation at the L4-L5 level, mild diffuse disc bulge within the lumbrosacral spine at the level of L3-4 through L5-S1, and mild encroachment of the right L3 neural foramen. There had been no significant interval change since last MRI (2/12/01) and the small left lateral disc protrusion at the L2-3 level was not clearly apparent.

On October 30, 2001, Mr. Mercer was seen at UMass Memorial Medical Center by Dr. Lance Warhold. The notes from this visit indicate that he had a several year history of right arm pain without antecedent trauma.

On October 31, 2001, Mr. Mercer had an MRI of his cervical spine done by Central Mass. Magnetic Imaging Center. The results of this indicated extensive multilevel degenerative change associated with central canal narrowing, most prominent at the C4-5 and 5-6 levels. There was also a component of congenital narrowing of the central canal as a contributing factor. Some subtle linear increased T2 signal within the spinal cord at the C6 level was noted.

On November 13, 2001, Mr. Mercer returned to Dr. Warhold. Mr. Mercer was advised that he did not seem to have a hand surgical issue at that time. It was likely his pain was neurogenic in nature even though he'd had negative EMG's in the past. Mr. Mercer commented that he felt his symptoms might be related to a sequence of falls which he had at work. The questions were deferred to Mr. Mercer's neurosurgeon Dr. Blume, whom he was to see in one week.

On December 4, 2001, Mr. Mercer had a cervical spine CT performed by Boston Imaging Associates. The impression was degenerative disc changes from C3-4 through C5-6 consisting of disc space narrowing, concentric osseous ridging with spur formation particularly posteriorly and posterolaterally. This caused mild spinal stenosis at C4-5 and C5-6 on the right side.

First Surgery

On April 18, 2002, Mr. Mercer was admitted at Beth Israel Deaconess Medical Center (BIDMC) for back surgery performed by Dr. Blume. The surgery was a left hemilaminectomy and medial facetectomy. Mr. Mercer was discharged from the hospital on April 21, 2002.

On May 17, 2002, Mr. Mercer followed up with Dr. Blume postoperatively. It was noted that Mr. Mercer was walking better. He no longer had shooting pain down the left lower extremity. Mr. Mercer did note however that he got electric shock like feelings when he coughed or sneezed beginning in the neck and radiating through both upper extremities to the hands. His incision was well healed with very little tenderness. He seemed to be coming along well relative to his low back pain. He was instructed to begin physical therapy for his low back and return for follow up in two months.

On July 24, 2002, Mr. Mercer had a routine follow up appointment with Dr. Blume. The notes indicate that he no longer had any shooting pain in his left lower extremity, but was experiencing tingling in the left lateral foot, toes and leg. He still had lower back pain that seemed to have increased.

On February 5, 2003, Mr. Mercer had his last appointment with Dr. Howard Blume. The pain in Mr. Mercer's neck and upper extremities had worsened. He had pain in both arms, numbness in his hands, and aching in his neck, arm and forearms. He was up to four Percocet per day. He was to see a therapist. The insurer had still not given approval for the surgical treatment of the cervical spine which clearly was necessary and beyond all reasonable medical doubt, the result of the work injury of September 30, 2000. The current exam showed more hyper-reflexia in the triceps and lower extremities. This was cause for some concern of progression of effects of the cord compression in the cervical spine at the C4-5 and C5-6 levels. Clearly decompression was needed with anterior cervical disc excisions and fusions. X-rays taken that day showed diffuse degenerative changes.

On March 13, 2003, Mr. Mercer was first seen by Dr. Peter Cherchia of Tri-Valley Counseling Associates. The notes from this session are set up as an individual treatment plan. Dr. Cherchia's notes list the problems as the inability to work due to complications, inability to perform sexually, unable to do any of his previous avocations, experiencing depression and anxiety. Dr. Cherchia was going to teach Mr. Mercer coping skills in addition to the basic cognitive and behavioral therapy.

On May 7, 2003, Mr. Mercer was again seen by Dr. Rachlin. Mr. Mercer felt that things were getting slowly worse. His neck and arm pain were more severe than his lower back pain. He had a follow up MRI of the cervical spine. It continued to show severe cervical spondylosis at C3-4, 4-5 and 5-6 levels. At C4-5 there was moderate to severe spinal cord and bilateral neuroforaminal narrowing. There was more moderate narrowing at C3-4 and 5-6. Options included doing nothing and living with the symptoms; a trial of cervical epidural steroid injections; or an anterior cervical discectomy and fusion. Dr. Rachlin agreed with Dr. Blume that the cervical spondylosis was likely aggravated by his history of fall.

Through the spring of 2003, Mr. Mercer treated with Dr. Cherchia for depression. By May 30, 2003, Dr. Cherchia noted that Mr. Mercer had improved since his prior appointment. He had fears of disability, but there were some signs of positive hopefulness.

On October 6, 2003, another appointment was held between Mr. Mercer and Dr. Cherchia. The doctor noted that Mr. Mercer's mood was improved, his energy level was higher, though physically there was no change. Forgetfulness was a concern and he feared a loss of his cognitive skills. He indicated that this was probably unfounded, more a function of the anxiety over money and the future.

On March 2, 2004, Mr. Mercer was seen again by Dr. Cherchia. As his status was unchanged, they discussed terminating the sessions. He felt more capable and competent, though he was still experiencing sadness, anger and fear.

On April 6, 2004, Mr. Mercer again reported to Dr. Cherchia. The notes indicate that he was much improved and would end therapy after the next session.

On April 20, 2004, Mr. Mercer returned for what was supposed to be his final session with Dr. Cherchia. While his status was listed as much improved, he was to be seen one more time. They discussed Mr. Mercer's chronic pain and the uncertainty of his future operation.

On May 4, 2004, Mr. Mercer arrived for his final session with Dr. Cherchia. He continued to be concerned about his future surgery. He was optimistic though, counting the positives in his life that have not been lost.

On August 21, 2005, Mr. Mercer was seen at Milford Whitinsville Regional Hospital for an MRI of the cervical spine. The findings were as follows: "height and alignment maintained. There was degenerative signal in C3 and C4. Reversal cervical lordosis demonstrated. Cervical spinal cord demonstrates normal anatomic configuration and no abnormal T2 hyperintensity. No syrinx". The overall impression of this study was "multi-level degenerative change with spinal stenosis C4-5 and C5-6.

On September 13, 2005, Mr. Mercer was seen for an initial consultation with Dr. Stephen Saris in Rhode Island. Dr. Saris obtained Mr. Mercer's history, including not only medical information, but also social and familial history.

Second Surgery

On October 5, 2005, Mr. Mercer was admitted to Our Lady of Fatima Hospital in North Providence, RI under the care of Stephen Saris, M.D. A cervical laminectomy was performed. Under general anesthesia, an incision was made and carried down to the dorsal spine. An x-ray confirmed the location. A C4-C6 laminectomy was performed.

On October 20, 2005, Mr. Mercer returned to Dr. Saris in follow up. Mr. Mercer was doing relatively well. His wound was healing appropriately. His preoperative symptoms hadn't changed. Mr. Mercer understood that it could take weeks and months before showing signs of improvement. He was to be sent for physical and occupational therapy to address his neck pain as well as his extremity complaints of numbness and clumsiness. His Percocet was refilled.

On October 27, 2005, Mr. Mercer was seen at HealthSouth in Milford for a physical therapy assessment. Therapist Denise Tetreault indicated that Mr. Mercer would benefit from treatment including modalities, AROM/PROM, manual therapy, strengthening exercises, home exercise program, massage/myofascial release, posture/body mechanics, and aerobic conditioning. He would be seen twice per week for at least 8 weeks. He was discharged from physical therapy on December 27, 2005 as he had reached maximum potential. He would continue with his home exercise program and follow up with his physician.

On November 8, 2005, Mr. Mercer was seen at Northwest Health Center by Dr. Steven Hokeness. This was his initial visit to his new primary care physician.

On December 1, 2005, Mr. Mercer returned to Dr. Saris for a follow up appointment. He had done fairly well. On examination Mr. Mercer looked well. He was walking across the office with a singe-point cane. He slightly favored one leg. His hand dexterity was good though slightly worse in the right side. An MRI showed excellent decompression. There were two spots of abnormal cord signal that were more apparent at this point then on the scan prior to the surgery. He was to return one year from date of surgery to determine his final outcome.

On December 9, 2005, Mr. Mercer returned to Dr. Hokeness in follow up. He was still having persistent chronic low back pain and arm pain. Dr. Hokeness currently has Mr. Mercer on 4 Percocet daily to manage his pain. Dr. Hokeness also noted that his depression and the relevant medications continued.

-10-

In a report dated June 3, 2003, Dr. Wepsic, doing a medical evaluation on behalf of the plaintiff, opined that "Mr. Mercer is permanently and totally disabled from performing any meaningful work because of his difficulties with both the cervical and lumbar spines. He has marked restriction of cervical spine motion, weakness in his hands, and sensory loss, which would preclude him taking part in less physical activities and because of his lumbar spine, he is unable to bend or lift more than 10 pounds, which would eliminate the possibility of returning to work as a truck driver and milk deliverer. In my opinion there is a causal relationship between his industrial injury of September 30, 2000 and his disability." Dr. Wepsic opined that the cervical and lumbar injuries were aggravations of significant pre-existing conditions.

## LOST EARNINGS

The plaintiff claims that as a result of his injuries, he has incurred medical bills in excess of $93,755, all of these bills were paid by the workers' compensation insurer. In addition, the plaintiff claims to have suffered a loss of income as a result of this injury. At the time of his accident, Mr. Mercer was earning approximately $910.92 per week as a delivery driver for Garelick Farms. He has been unable to return to work since the date of his accident. On average he made $40,000.00 annually.

There is a workers' compensation lien in excess of $354,997.00 (As of 5/12/06). The workers' compensation case lump summed on March 30, 2004 for $200,00.00 with Mr. Mercer receiving $161,025.00. This settlement represented approximately 8 years of future workers' compensation benefits. In addition Mr. Mercer is receiving SSDI benefits of $1462.00 per month.

Finally, there is a significant loss of consortium claim filed by Cynthia Mercer. Obviously, this accident has had a dramatic effect on their home and personal lives. At the time of the accident, Mrs. Mercer worked earning approximately $30,00.00 per year. She continues to work at the present.

## II.  DEFENDANT'S POSITION

The defendant denies liability and contests the nature and severity of the Plaintiffs' claimed injuries and damages.  If this matter were to proceed to trial, the defendant intended to call numerous expert witnesses to testify to the following: (a) that Plaintiff Kenneth Mercer's description of the incident could not, from a scientific bio-mechanical engineering perspective, cause the injuries complained of; and (b) that Mr. Mercer's claims of injury are the result of degeneration of his cervical and lumbar spine and not due to the trauma allegedly sustained on September 30, 2000.  Moreover, if this matter were to proceed to trial, the defendant intended upon calling an expert engineer to testify regarding the defendant's proper maintenance practices with respect to the subject vehicle and the Plaintiff's own failure to exercise due care on the date of the incident.  Finally, the defendant would also rely upon an expert neurologist who conducted an Independent Medical Examination and concluded that Mr. Mercer is not presently disabled and has a normal neurological examination.

## III.  SETTLEMENT

After extensive negotiations and a mediation, the parties have agreed to settle Kenneth and Cynthia Mercer's liability claim  for $710,000.00.   Keches & Mallen, P.C. has a thirty-eight percent contingent fee of $269,800.00.  In addition, Keches& Mallen. P.C. has expenses in the amount of $20,571.80.  The workers' compensation carrier has agreed to net back a recovery of $104,862.05.  The gross workers' compensation lien is $354,997.97 reduced to a gross lien of $177,500.00.

The Plaintiff, Kenneth Mercer  will net $104,862.05 from this settlement (in addition to the workers' compensation net settlement of $161,025.00.  The Plaintiff Cynthia Mercer will net $209,724.10.  Pursuant to Hunter v. Midwest Coast Transport, Inc., et al, 400 Mass. 779 (1987), the workers' compensation insurer will pay 40.92% of any future medical benefits until it has exhausted its offset of $104,862.05.  Currently, Mr. Mercer's ongoing medical treatment includes Percocet medication which costs approximately $100.00 per month and twice per year appointments with his primary care physician.

Based on the damages issues as discussed above, the willingness of the workers' compensation carrier to reduce its lien, and the Plaintiffs' strong wish to avoid trial, the Plaintiff accepted the settlement offer of $710,000.00

The settlement will break down as follows:

**1. Gross Settlement to Kenneth Mercer and Cynthia Mercer:**                 **$  710,000.00**
Disbursement :

      **Cynthia Mercer:**                                                    **$  209,724.10**
      $355,000.00 - (pro rated portion of attorney fee $134,900.00) - (pro rated portion of attorney expenses $10,375.90) = $209,724.10


      **Kenneth Mercer:**                                                   **$  104,862.05**
      $710,000.00 - ($355,000 allocation to Cynthia Mercer) = 355,000.00 - (agreed workers' compensation gross lien recovery of $177,500) - (pro rated portion of attorney fee $67,450.00 ) and - (pro rated portion of attorney expenses  $5187.95 ) = $104,862.05


      **CNA:**                                                              **$  104,862.05**
      Gross Workers' Compensation lien of $354,997.97 reduced to a gross recovery of $177,500.00 - (pro rated portion of attorney fee $67,450.00) - (pro rated portion of attorney expenses $5187.95) = $104,862.05


      **Keches & Mallen, P.C. Fee:**                                        **$  269,800.00**
      Contingent fee of 38%


      **Keches & Mallen, P.C. Expenses:**   (see attached itemization)   **$   20,751.80**

## IV.  Jurisdiction

Jurisdiction over the instant Petition is expressly conferred upon this Court by M.G.L. Chapter 152 § 15, which states that the Petition requires "the approval of ... the court in which the action has been commenced."

## V.  Conclusion

For the reasons stated herein, the Parties respectfully request that this honorable Court approve this Petition.

Brian C. Dever, Esq. BBO #544203
KECHES & MALLEN, P.C.
122 Dean Street
Taunton, MA 02780
508-822-2000
Attorney for Plaintiffs

Peter Brown, Esq.
Tentindo, Kendall, Canniff & Keefe, LLP
C-3 Shipway Place
Boston, MA 02129
(781) 284-5657
Fax: (617) 242-0800
Attorney for the Defendant

Paul M. Scannell, Esq.
Law Offices of Jacqueline L. Allen
262 Washington St., Suite 601
Boston, MA 02108
Tel. #617-878-4600
Attorney for the Workers' Compensation Carrier

-14-

## CONFIRMATION OF AGREEMENT BY PLAINTIFF

I, Kenneth Mercer, hereby state under the penalties of perjury, that I have read the foregoing Petition and that the terms of the settlement have been explained to me by my counsel. I realize that by agreeing to the settlement, I am forever terminating all my rights, claims, and causes of action of every kind and nature against the defendants in this action, their servants, agents and employees arising out of my accident of September 30, 2000. In light of the above facts, I formally confirm that I desire this case be settled in accordance with the above terms and conditions.

6-09-06
Date

Kenneth R Mercer
Kenneth Mercer

6-9-06
Date

Cynthia A. Mercer
Cynthia Mercer

-17-

Kenneth Mercer

| DATE | CHECK# | PROVIDER | SERVICES(S) | AMOUNT |
|---|---|---|---|---|
| 8/30/01 | 4352 | Braintree Hospital | meds | $5.00 |
| 9/6/01 | 4391 | Smart Corporation | meds | $19.96 |
| 4/15/03 | 7175 | Tri-County Medical | meds | $25.00 |
| 7604 | 8/11/03 | Suffolk Superior | filing fee | $515.00 |
| 11/6/03 | 7956 | Suffolk Sheriffs | Serv on Ryder | $37.00 |
| 2/23/04 | 8402 | Tucker, Heifetz | Postage re KOR docs produced | $10.52 |
| 2/23/04 | 8403 | Merrill Corp | Photocopy costs re KOR docs produced | $108.68 |
| 2/23/04 | 8404 | Merrill Communications | Photocopy costs re KOR docs produced | $132.29 |
| 9/28/04 | 9249 | Beth Israel Deaconess Hosp | Cert bill | $10.00 |
| 9/28/04 | 9250 | Beth Israel Deaconess | Cert meds | $52.38 |
| 9/28/04 | 9248 | Automated Medical Systems | bills of Boston Imaging | $10.00 |
| 9/28/04 | 9248 | Affiliated Professional Serv | Cert meds & bills of CentMass Imaging | $20.00 |
| 1/10/05 | 9645 | Parkland Medical Assoc | meds | $15.00 |
| | | Photo Magic | photos | $17.58 |
| 2/1/05 | 9815 | Landmark Med Ctr | cert bill | $25.00 |
| 2/1/05 | 9814 | Holt & Assoc | Inspection | $1,638.60 |
| | | Photo Magic | laser copies | $4.41 |
| 2/9/05 | 9855 | Landmark Medical Ctr | Cert meds | $22.90 |
| 2/25/05 | 9950 | HealthSouth | Cert bill | $8.50 |
| | | Photo Magic | Photo album | $7.99 |
| | | Photo Magic | photos | $13.49 |
| 7/18/05 | 10717 | Medical Record Assoc | Cert Meds of U.Mass. | $19.47 |

| DATE | CHECK# | PROVIDER | SERVICES(S) | AMOUNT |
|---|---|---|---|---|
| 7/18/05 | 10719 | Jacob R. Rachlin, M.D. | Meds | $37.00 |
| 7/29/05 | 10774 | Automated Medical Systems | Meds of Boston Imaging Assoc | $10.00 |
| 7/22/05 | | Photo Magic | 3 Sets of laser copies of photos | $6.62 |
| 8/30/05 | | Photo Magic | photos | $26.04 |
| 9/16/05 | 11023 | Medical Record Assoc | Meds of Milford Whitinsville Regional Hosp | $69.82 |
| 9/16/05 | 11046 | McCausland Economic Assoc | Retainer | $1,200.00 |
| 10/6/05 | 11133 | Tri Valley Counseling (Dr. Cherchia) | cert bill | $50.00 |
| 10/6/05 | 11127 | Ellen M. Fritch & Assoc. | Depo of Eric Fritton | $598.85 |
| 10/6/05 | 11128 | HealthSouth Braintree | cert meds | $78.00 |
| 10/14/05 | 11146 | Ellen M. Fritch & Assoc. | depo transcripts of Joao M. Castro and Robert L. Houle | $523.75 |
| 10/14/05 | 11147 | Esquire Deposition Services | Depo of Ken Mercer | $1,048.00 |
| 10/14/05 | 11148 | Ellen M. Fritch & Assoc. | Depo of Tom Parr | $675.70 |
| | | Photo Magic | laser copies | $17.64 |
| 10/17/05 | 11163 | Neurosurgery Associates | Dr. Stephen Saris cert recs | $25.00 |
| 10/18/05 | 11234 | AMSplus | meds of Boston Imaging | $10.00 |
| 10/28/05 | 11261 | DeTerra Reporting Service | 30(b)(6) depo of Ryder by Jeffrey H. Lilley | $715.50 |
| 10/28/05 | 11260 | Assoc in Anesthesia | cert bill | $25.00 |
| 10/19/05 | 11239 | Richard T. Corbett | Mediation fee | $400.00 |
| 10/28/05 | 11262 | New Eng. Medical Legal Consultants, Inc. | Orthopedic Group x-ray films | $25.00 |

| DATE | CHECK# | PROVIDER | SERVICES(S) | AMOUNT |
|------|--------|----------|-------------|--------|
| 11/2/05 | 121315 | Medical Record Assoc | cert meds | $50.58 |
| 11/10/05 | 11372 | Ellen M. Fritch & Assoc. | Depos of Michael Russo, Timothy Tetrault & Robin Hamel $1,118.80 less $62.00 see bio of 1/3/06 | $1,056.80 |
| 11/10/05 | 11368 | DeTerra Reporting Serv. | Depo of Brian Nadeau | $484.50 |
| 11/10/05 | 11381 | UMass Memorial MRI and Imaging Ctr | Copies of MRI films. | $35.00 |
| 11/10/05 | 11382 | Central Mass Magnetic Imaging | copies of films | $54.00 |
| 11/17/05 | | Photo Magic | laser copies | $12.60 |
| 11/21/05 | 11405 | Dr. Stephen Saris | Mtg w/BCD on 11/28 | $250.00 |
| 12/9/05 | 11428 | Holt Associates | Progress Billing | $380.00 |
| 12/9/05 | 11429 | St. Joseph Health Services | Cert bill | $20.00 |
| 12/9/05 | 11430 | Med Record Assoc. | Med records of Umass Memorial Health Care | $19.97 |
| 12/9/05 | 11431 | Ellen M. Fritch & Assoc | depo of Phil Michaud | $556.45 |
| 1/4/06 | 11554 | Ellen M. Fritch & Assoc | Day 2 depo of Jeff Lilley | $389.50 |
| 1/4/06 | 11557 | Milford Gastroenterology Assoc | meds | $50.00 |
| 1/4/06 | 11556 | Ellen M. Fritch & Assoc | 30b6 of Garelick by Laurent Bourget and Arthur Boutiette | $502.90 |
| 1/4/06 | 11553 | CVS Pharmacy | Cert Prescription record | $25.00 |

| DATE | CHECK# | PROVIDER | SERVICES(S) | AMOUNT |
|---|---|---|---|---|
| 1/4/06 | 11560 | Tri-County Medical/Franklin Primary Care | med records | $25.00 |
| 1/31/06 | 11709 | Northwest Health Center | Cert meds | $5.95 |
| 1/31/06 | 11708 | Eppley Court Reporting | Depo of Cynthia Mercer | $413.20 |
| 1/31/06 | 11710 | HealthSouth | Cert meds | $30.00 |
| 2/6/06 | 11753 | HealthSouth | Cert bills | $7.50 |
| 2/14/06 | 11804 | Ralph A. Sherman, MD | Cert meds | $50.00 |
| 2/24/06 | 11861 | Northwest Health Ctr | med records | $40.60 |
|  |  | Photo Magic | laser copies | $14.33 |
|  |  | Photo Magic | photos | $434.21 |
| 3/28/06 | 12028 | Open MRI of New England | cert meds | $15.00 |
| /06 |  | Photo Magic | Laser copies | $1.10 |
| 4/10/06 | 12096 | DeTerra Reporting Service | 30(b)(6) depo of Waltco | $1,002.00 |
| 4/4/06 | 12082 | Dr. James G. Wepsic | Retainer Fee | $800.00 |
| 4/20/06 | 12101 | Barnes & Noble | book accident injuries | $240.45 |
| 4/26/06 | 12142 | Holt Associates | Consulting Engineering Service | $4,422.50 |
| 5/31/06 |  | Photo Magic | scans, prints & mounts | $1,101.97 |
|  |  | **AS OF 6/2/06 LR** |  | **$20,751.80** |

## CONTINGENT FEE AGREEMENT

The Client _Kenneth Mercer  645 Roundtop Rd  Harrisville RI_
                        (Name)              (Street & Number)              (City or Town)
                                                                    02830

retains the Attorney _Keches & Mallen, P.C., 122 Dean Street, Taunton, Massachusetts 02780_
                        (Name)              (Street & Number)              (City or Town)

to perform the legal services mentioned in paragraph (1) below.  The attorney agrees to perform them faithfully and with due diligence.

(1)  The claim, controversy, and other matters with reference to which the services are to be performed are:

9/30/00

(2)  The contingency upon which compensation is to be paid is:

Recovery against the defendant(s) by way of settlement or judgment.

(3)  The client is not to be liable to pay compensation otherwise than from amounts collected from him by the attorney, expect as follows:

See Paragraph 4.

(4)  Reasonable compensation on the foregoing contingency is to be paid by the client to the attorney, but such compensation (including that of any associated counsel) is not to exceed the following maximum percentage of the gross amount collected.

_38%_   percent plus expenses before trial;

_38%_   percent plus expenses after trial has begun.

(5)  The client is in any event to be liable to the attorney for his reasonable expenses and disbursements (which include postage, xeroxing, facsimile transmissions, mileage, parking, long distance telephone calls, etc.).

(6)  If the attorney is discharged by the client prior to the conclusion of this representation, the attorney is entitled to be then compensated for his reasonable expenses and disbursements.  Further, the attorney is to be compensated for the fair value of the services rendered to the client up to the time of discharge, but the amount of the fee shall not be due to the attorney until the subject matter litigation is concluded pursuant to Paragraph 2 and 3 above.

This agreement and its performance are subject to Rule 3:05 of the Supreme Judicial Court of Massachusetts.

### WE EACH HAVE READ THE ABOVE AGREEMENT BEFORE SIGNING IT

Witnesses to signatures

(To client) _Kenneth R. Mercer_                    _Kenneth R. Mercer_
                                                                    (signature of client)

(To Attorney) _____

                        Dated _May 4, 2001_                    _____
                                                                    (signature of attorney)

# CONTINGENT FEE AGREEMENT

The Client  _Cynthia Mercer 645 Round Top Rd Harrsville_
                          (Name)                (Street & Number)         (City or Town)

retains the Attorney  _Keches & Mallen, P.C., 122 Dean Street, Taunton, Massachusetts 02780_
                               (Name)             (Street & Number)        (City or Town)

to perform the legal services mentioned in paragraph (1) below.  The attorney agrees to perform them faithfully and with due diligence.

(1) The claim, controversy, and other matters with reference to which the services are to be performed are:

_Accident of 9/30/2000_

(2) The contingency upon which compensation is to be paid is:

> Recovery against the defendant(s) by way of settlement or judgment.

(3) The client is not to be liable to pay compensation otherwise than from amounts collected from him by the attorney, expect as follows:

> See Paragraph 4.

(4) Reasonable compensation on the foregoing contingency is to be paid by the client to the attorney, but such compensation (including that of any associated counsel) is not to exceed the following maximum percentage of the gross amount collected.

> ____38____  percent plus expenses before trial;
>
> ____38____  percent plus expenses after trial has begun.

(5) The client is in any event to be liable to the attorney for his reasonable expenses and disbursements (which include postage, xeroxing, facsimile transmissions, mileage, parking, long distance telephone calls, etc.).

(6) If the attorney is discharged by the client prior to the conclusion of this representation, the attorney is entitled to be then compensated for his reasonable expenses and disbursements.  Further, the attorney is to be compensated for the fair value of the services rendered to the client up to the time of discharge, but the amount of the fee shall not be due to the attorney until the subject matter litigation is concluded pursuant to Paragraph 2 and 3 above.

This agreement and its performance are subject to Rule 3:05 of the Supreme Judicial Court of Massachusetts.

## WE EACH HAVE READ THE ABOVE AGREEMENT BEFORE SIGNING IT

Witnesses to signatures

(To client) _____    x _Cynthia A Mercer_
                                                 (signature of client)

(To Attorney) _____

             Dated _11/6/03_ _____         (signature of attorney)

# KECHES & MALLEN, P.C.

### ATTORNEYS AT LAW

122 Dean Street
Taunton, MA 02780
(508) 822-2000
Fax (508) 822-8022
*www.keches-mallen.com*

| | | |
|---|---|---|
| George N. Keches | Kathy Jo Cook | |
| Richard T. Mallen | Claudine A. Cloutier* | |
| Joseph F. Agnelli, Jr. | Seth J. Elin | |
| Brian C. Cloherty | Matthew F. King | |
| Brian C. Dever | Ernest J. Palazzolo, Jr. | |
| Judith B. Gray** | Mark D. Warcup | |
| Charlotte E. Glinka | Daniel M. Surprenant | |
| | Kristen E. Ferris* | |

*Of Counsel*
Ann Marie Maguire          Gregg J. Pasquale
                          Melissa A. White

*Admitted in Massachusetts and Rhode Island
**Admitted in Massachusetts, Rhode Island and Connecticut

**DIRECT ALL CORRESPONDENCE TO
THE TAUNTON OFFICE**

**BOSTON OFFICE**
141 Tremont Street, 6th Floor
Boston, MA 02111
(617) 426-7900

**FALL RIVER OFFICE**
321 North Main Street
Fall River, MA 02721
(508) 676-7900

**WORCESTER OFFICE**
41 Elm Street
Worcester, MA 01609
(508) 798-7900

**NEW BEDFORD OFFICE**
167 William Street
New Bedford, MA 02740
(508) 994-7900

June 9, 2006

Peter Brown, Esq.
Tentindo, Kendall, Canniff & Keefe, LLP
C-3 Shipway Place
Boston, MA 02129

Paul M. Scannell, Esq.
Law Offices of Jacqueline L. Allen
262 Washington Street, Suite 601
Boston, MA 02108

> **Re:    Kenneth and Cynthia Mercer**
> **vs.    Ryder Truck Rental, Inc. and  Waltco Truck Equipment Company**

Dear Counsel:

This letter will serve to confirm that both of you have given me permission to sign your names to the Settlement Petition in this case.  I will be electronically filing the petition with the Court this afternoon.

Thank you.

Very truly yours,

KECHES & MALLEN, P.C.

Brian C. Dever

BCD/mes
Enclosure